UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RICHARD J. PLECONIS, SR.,<br><br>       Plaintiff,<br><br>  v.<br><br>INTERNAL REVENUE SERVICE,[1]<br><br>       Defendant. | Civil Action No. 09-5970 (SDW) (ES)<br><br><br>**OPINION**<br><br><br>August 10, 2011 |

**WIGENTON**, District Judge.

  Before the Court is Defendant, United States of America's, ("Defendant") Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 ("Motion"). This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b). This Court, having considered the parties' submissions, decides this matter without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons stated below, this Court **GRANTS** Defendant's Motion.

**FACTUAL AND PROCEDURAL BACKGROUND**

  Plaintiff Richard Pleconis ("Plaintiff") and his wife Dolores Pleconis (Mrs. Pleconis") did not file their joint income tax returns for the tax years of 1999, 2000, 2001, 2002, and 2003 until November 8, 2007. (Def.'s Ex. 1.) Plaintiff testified that he was aware he had within three years to file of the filing deadline to file his taxes. (Def.'s Ex. 8, R. Pleconis Dep. 85:4-7.) Plaintiff claimed that his failure to file tax returns during these years was due to "extreme medical circumstances" that he suffered between approximately 1999 and 2007. (Def.'s Ex. 1.) Mrs. Pleconis asserts that she did not file income tax returns during these years because she left the

---

[1] Although Plaintiff names the Internal Revenue Service (the "IRS") as Defendant, the United States of America is the real party in interest.

1

finances to Plaintiff and "never even thought of [i]ncome tax." (Pl.'s Ex. 4, D. Pleconis Dep. 18:5-9.) As a result of Plaintiff's failure to file taxes for the years in question, Defendant assessed interest and penalties against him and his wife. (Compl. ¶ 15.) On December 6, 2003, Plaintiff received a letter from the IRS stating its intentions to levy Plaintiff's assets for the taxes he owed for the 2000 tax year. (Def.'s Ex. 8, R. Pleconis Dep. 81:6-82:5; Def.'s Ex. 9.) Subsequently, on June 16, 2004, Plaintiff's bank notified him that the IRS had levied one of his bank accounts. (Def.'s Ex. 10.) Additionally, Defendant denied Plaintiff's claims for refunds for the years in question because he did not file his taxes within the three-year limitations period. (Compl. ¶ 13.)

Plaintiff initiated this action on November 23, 2009, seeking the forfeited refunds and the abatement and forgiveness of all the penalties and interest charges imposed for the 1999, 2000, 2001, 2002, and 2003 income tax years. (Compl. ¶ 2.) Because the resolution of the instant action turns on whether Plaintiff and Mrs. Pleconis were medically unable to file tax returns between 1999 and 2003, a discussion of their relative health conditions during these years follows.

**Richard Pleconis**

Plaintiff is the sole owner of Electronic Measurement Laboratories, Inc., ("EML"), a company that sells and services gas detection devices. (Def.'s Ex. 8, R. Pleconis Dep. 22:12-21.) Between January 1999 and March 2001, Plaintiff worked as the President of EML. (Id. at 23:24-24:15, 29:9-12.) Plaintiff did not undergo any surgeries between 1999 and 2000; however, during this time period, Plaintiff was saddled with marital problems and an employee who had taken out a fraudulent credit card in Plaintiff and EML's names. (Def.'s Ex. 7, R. Pleconis Dep. 99:13-101:4.) Defendant submits that these preoccupations are the main reason Plaintiff failed to

file tax returns in 1999, 2000, and 2001, (Def.'s Br. 3), and Plaintiff concedes that these concerns—combined with his depression—are the main reasons he failed to file his tax returns in those years. (Def.'s Ex. 7, R. Pleconis Dep. 99:19-101:4.)

In March 2001, Plaintiff suffered a back injury while playing golf and consequently went on disability from work. (Def.'s Ex. 12 at 1-3.) Despite his injury, Plaintiff continued to serve as the President of EML. (Def.'s Ex. 8, R. Pleconis Dep. 29:18-30:1.) As the President of EML, Plaintiff signed corporate documents, advised EML's management, attended conferences, and spoke with important clients on a one-on-one basis. (Id; see id. at 62:8-63:8, 127:16-128; Def.'s Ex. 7, R. Pleconis Dep. 40:19-24, 41:7-21.) Notably, Plaintiff signed EML's corporate income tax returns between 2000 and 2003, which were filed on time. (Def.'s Ex. 5 at Nos. 26-35; Def.'s Ex. 19.) Moreover, Plaintiff was able to talk on the phone, watch television, surf the internet, drive to the pharmacy for his prescriptions, and do "light grocery shopping." (Def.'s Ex. 8, R. Pleconis Dep. 49:12-16.)

Due to his golf injury, Plaintiff underwent five back surgeries between June 2001 and September 2004. (Def.'s Ex. 15 at 8; see id. at 6.) Although these surgeries imposed physical limitations on Plaintiff, he was able to perform nonphysical work and his mental abilities were not impacted. (Def.'s Ex. 16, Malberg Dep. 12:17-21, 90:21-91:13.) Additionally, Plaintiff was prescribed prescription narcotic painkillers for his back injury, but he took them intermittently. (See id. at 21:21-23, 60:12-19.) However, when he did take them, the painkillers rendered Plaintiff confused and "out of it." (Pl.'s Ex. 4, D. Pleconis Dep. 22:20; Pl.'s Ex. 8, Pleconis, Jr. Dep. 15:20-25.) Nonetheless, Plaintiff, with the help of his son, continued to play an active role within EML. (Pl.'s Ex. 8, Pleconis, Jr. Dep. 13:10-22, 16:7-16.) For instance, in 2003, Plaintiff

attended an important business conference for EML in New Orleans, LA. (Def.'s Ex. 7, R. Pleconis Dep. 40:19-24, 41:2-21.)

Sometime in late 2004 or early 2005, Plaintiff recovered from these surgeries. (See Def.'s Ex. 16, Malberg Dep. 74:14-75:3.) At some point in 2006, his back condition stabilized and no further surgeries were necessary. (Id. at 77:12-15.)

In addition to his back injury, Plaintiff suffered from a heart condition, sleep apnea, obstructive sleep, and restless leg syndrome from March 2001 to December 2005.[2] Plaintiff was also diagnosed with an OxyContin dependency in 2003. (Pl.'s Ex. 7, Das Dep. 20:16-18.) Plaintiff underwent heart surgery in August 2001 and again in March 2005. (Def.'s Ex. 17, Jeganathan Dep. 28:2-6; Def.'s Ex. 15 at 6, 7.) His cardiologist testified that the surgeries could have caused Plaintiff to become forgetful, but such forgetfulness could only be a "short-term thing" and would not cause Plaintiff to forget to pay income taxes. (Def.'s Ex. 17, Jeganathan Dep. at 78:5-79:3, 79:13-21.)

By the end of 2005, Plaintiff's condition had improved and most of his pain "ha[d] been resolved." (Pl.'s Ex. 7, Das Dep. 51:12-14.) On or around December 2005, after he became ineligible for disability payments, Plaintiff took on the administrative responsibilities at EML. (Def.'s Ex. 7, R. Pleconis Dep. 31:23-32:23, 34:10-17.) By January 2006, his heart issues had improved and stabilized and his sleep apnea "was completely controlled." (Def.'s Ex. 17, Jeganathan Dep. 56:14-57:1, 57:3-19; Def.'s Ex. 18, Das Dep. 12:2-3.)

**Mrs. Pleconis**

From approximately 1994 to 2003, Mrs. Pleconis worked as a part-time secretary for Rutgers University ("Rutgers"). (Def.'s Ex. 6, Pleconis D. Dep. 10:21-12:2.) However, between

---

[2] Plaintiff was diagnosed with sleep apnea on January 16, 2003. (Def.'s Ex. 18, Das Dep. 8:18-24, 9:21-10:3.) But because Plaintiff stopped seeing his doctor for this condition between October 22, 2003 and June 1, 2005, it is unclear how long, or to what extent, Plaintiff suffered from this condition. (See id. at 36:12-16.)

2003 and 2006, she worked at this job on a full-time basis. (Id. at 11:21-12:12.) Mrs. Pleconis also worked for Plaintiff's company, EML, during the tax years in question, but the exact dates of her employment there are uncertain. (Id. at 12:13-25; Def.'s Ex. 8, R. Pleconis Dep. 56:24-57:18.) Although Plaintiff testified that he needed help paying the bills in 2000, (Def.'s Ex. 7, R. Pleconis Dep. 98:3-10), his wife claims that it was still his responsibility to pay the bills even when he was "out of it." (Pl.'s Ex 4, D. Pleconis Dep. 24:12-15.) Mrs. Pleconis also testified that she "never even thought of income tax" because her husband "always took care of the income tax" and she "had no information to file" their taxes. (Pl.'s Ex. 4, D. Pleconis Dep. 18:8-14.) Although Mrs. Pleconis stated that she could not have filed their taxes, she asserted that EML's accountant, Alex Licari, assisted her and her husband with preparing their personal tax returns. (Id. at 18:24-19:7.) She also testified that she did not have any conversations with her husband about their income taxes between 2000 and 2007 because she assumed her husband had filed them. (Id. at 22:14-20.) However, she admits that she did not suffer any mental or physical disabilities between 1999 and 2007. (Def.'s Ex. 5 at Nos. 19, 20; Def.'s Ex. 6, D. Pleconis Dep. 30:6-12.)

**STANDARD OF REVIEW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." Id. at 248. A dispute about a

5

material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Once the moving party meets its initial burden, the burden then shifts to the non-movant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculation, unsupported assertions or denials of its pleadings. Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp., 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." Black Car Assistance Corp. v. New Jersey, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of

6

proof," then the moving party is entitled to judgment as a matter of law.  Celotex Corp., 477 U.S. at 322-23.

**DISCUSSION**

    **I.**    **Whether Plaintiff Complied with the Revenue Procedure**

It is well settled that the United States is immune from suit unless it consents to be sued. United States v. Dalm, 494 U.S. 596, 608 (1990).  Nonetheless, "[a] taxpayer seeking a refund of taxes erroneously or unlawfully assessed or collected may bring an action against the Government either in the United States district court or in the United States Court of Federal Claims."  United States v. Clintwood Elkhorn Mining Co., 553 U.S. 1, 4 (2008).  However, before the taxpayer can bring such an action, he/she "must comply with the tax refund scheme established in the Code," which requires the taxpayer to file a claim with the IRS within a specific period of time.  Id.  Internal Revenue Code section 6511(a) provides that:

> Period of limitation on filing claim. Claim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid.  Claim for credit or refund of an overpayment of any tax imposed by this title which is required to be paid by means of a stamp shall be filed by the taxpayer within 3 years from the time the tax was paid.

26 U.S.C. § 6511(a).  Therefore "unless a claim for refund of a tax has been filed within the time limits imposed by § 6511(a), a suit for refund,  regardless of whether the tax is alleged to have been 'erroneously,' 'illegally,' or 'wrongfully collected,' may not be maintained in any court." Dalm, 494 U.S. at 602 (citation omitted).

However, § 6511(h) "permits the suspension of the limitations period while a taxpayer is unable to manage his or her financial affairs due to a disability." Estate of Rubinstein v. United States, 96 Fed. Cl. 640, 651 (Fed. Cl. 2011). Section 6511(h) provides:

> (1) In general. In the case of an individual, the running of the periods specified . . . shall be suspended during any period of such individual's life that such individual is financially disabled.
> (2) Financially disabled.
>
>   (A)   In general. For purposes of paragraph (1), an individual is financially disabled if such individual is unable to manage his financial affairs by reason of a medically determinable physical or mental impairment of the individual which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. An individual shall not be considered to have such an impairment unless proof of the existence thereof is furnished in such form and manner as the Secretary may require.

The guidelines to determine whether an individual is financially disabled are set forth in Revenue Procedure 99-21. Pursuant to Revenue Procedure 99-21, the taxpayer must submit the following statements to claim financial disability under § 6511(h):

> (1) a written statement by a physician . . . qualified to make the determination, that sets forth:
>  (a) the name and a description of the taxpayer's physical or mental impairment;
>  (b) the physician's medical opinion that the physical or mental impairment prevented the taxpayer from managing the taxpayer's financial affairs;
>  (c) the physician's medical opinion that the physical or mental impairment was or can be expected to result in death, or that it has lasted (or can be expected to last) for a continuous period of not less than 12 months;
>  (d) to the best of the physician's knowledge, the specific time period during which the taxpayer was prevented by such physical or mental impairment from managing the taxpayer's financial affairs; and

>   (e) the following certification, signed by the physician: I hereby certify that, to the best of my knowledge and belief, the above representations are true, correct, and complete.

Rev. Proc. 99-21(1) C.B. 960.

In support of their claim for a refund, Plaintiff submitted statements from Dr. Malberg, his orthopedic surgeon, and Dr. Jeganathan, his cardiologist. Dr. Malberg opined that Plaintiff underwent seven major procedures since June 2001 and that "[t]he surgeries, rehabilitation and pain medication <u>could be expected</u> to have an adverse effect on the patient's ability to carry out business and personal activities either correctly or in a timely fashion." (Def.'s Ex. 3) (emphasis added). Similarly, Dr. Jeganathan stated that "[d]ue to [] [Plaintiff's] medical condition, there <u>may be</u> adverse effects on the patient's ability to carry out business and personal activities correctly and in a timely fashion." (Def.'s Ex. 4) (emphasis added).

The revenue procedure specifically states that the physician should opine "that the physical or mental impairment <u>prevented</u> the taxpayer from managing the taxpayer's financial affairs." Rev. Proc. 99-21(1)(b) C.B. 960 (emphasis added). Neither of Plaintiff's physicians opined that his various impairments actually prevented him from managing his affairs. His physicians simply stated that his condition "could be expected" or "may" have had an adverse effect on his ability to manage his finances. Therefore, Plaintiff did not comply with the requirements set forth in Revenue Procedure 99-21. See <u>Henry v. United States</u>, 2006 U.S. Dist. LEXIS 93038, at * 10 (N.D. Tex. Dec. 26, 2006) (concluding that physician's statement that it was possible that the taxpayer's symptoms could have rendered her incapable of managing her financial affairs did not comply with Revenue Procedure 99-21).

### II. Whether Plaintiff was Financially Disabled from 1999-2007

#### a. 1999-2001

Plaintiff argues that summary judgment should not be granted because there is sufficient evidence that he was financially disabled from 1999-2001. (Pl.'s Br. 10). This Court disagrees. Plaintiff concedes that he did not file his tax returns in 1999, 2000, and 2001 because he was preoccupied with his marital problems and a work-related problem. (Def.'s Ex. 7, R. Pleconis Dep. 99:19-101:4.) However, such problems do not qualify as financial disabilities for purposes of an extension under § 6511(h). Consequently, this Court finds that Plaintiff was not disabled from 1999-2001.

#### b. 2001-2007

Plaintiff maintains that he was financially disabled from 2001-2007. This Court recognizes that Plaintiff underwent several surgeries and was taking narcotics and other painkillers at certain times during these years. However, the evidence indicates that these conditions did not prevent Plaintiff from managing his financial affairs. For instance, although the surgeries Plaintiff underwent between June 2001 and September 2004 imposed physical limitations on him, his orthopedic surgeon testified that Plaintiff could perform non-physical work and that the surgeries did not affect his mental abilities. (Def.'s Ex. 16, Malberg Dep. 12:17-21, 90:21-91:13.) Furthermore, after his injury in 2001, Plaintiff testified that he was able to talk on the phone, watch television, surf the internet, drive to the pharmacy for his prescriptions, and do "light grocery shopping." (Def.'s Ex. 8, R. Pleconis Dep. 49:12-16.) Moreover, although Plaintiff became dependent on narcotics, he was still involved with running his company. Notably, in 2003, Plaintiff attended an important business conference in New Orleans and he signed EML's corporate income tax returns between 2000 and 2003. (Def.'s Ex.

7, R. Pleconis Dep. 40:19-24, 41:2-21; Def.'s Ex. 19.)  Plaintiff's cardiologist also testified that although Plaintiff's surgeries could have caused short-term forgetfulness, it could not have caused him to forget to pay his taxes.  (Def.'s Ex. 17, Jeganathan Dep. 78:5-79:3,79:12-21.)

According to Dr. Malberg, Plaintiff recovered completely from his orthopedic surgeries in late 2004 or early 2005, and his back condition stabilized in 2006.  (Def.'s Ex. 16, Malberg Dep. 74:14-75:3, 77:12-15.)  In fact, around December 2005, Plaintiff took on the administrative responsibilities at his company.  (Def.'s Ex. 7, R. Pleconis Dep.  31:23-32:23, 34:10-17.)  Similarly, Plaintiff's cardiologist testified that by January 2006, Plaintiff's heart condition improved and stabilized.  (Def.'s Ex. 17, Jeganathan Dep. 56:14-57:1.) The evidence, therefore, shows that even during the periods when Plaintiff underwent surgeries, he was able to manage his finances.  Moreover, Plaintiff's conditions had improved by January 2006.  Hence, Plaintiff has failed to show that he was financially disabled from 2001-2007.

**III.    Whether Plaintiff's Wife was Financially Disabled from 1999-2007**

Defendant further contends that Plaintiff has no basis to seek an extension under § 6511(h) because his wife was not financially disabled during the years in question.  This Court agrees.  She claims she did not file taxes because Plaintiff usually filed the tax and she did not have the necessary information to file the taxes.  (Pl.'s Ex. 4, D. Pleconis Dep. 18:8-14.)  Mrs. Pleconis's lack of knowledge about filing taxes is not a basis for an extension.  A taxpayer may be granted an extension only if he/she is financially disabled; a financial disability is a mental or physical impairment that prevents the taxpayer from managing his/her financial affairs.  See Rev. Proc. 99-21(1) C.B. 960.  Mrs. Pleconis testified that she did not suffer any mental or physical disabilities between 1999 and 2007.  (Def.'s Ex. 5 at Nos. 19, 20; Def.'s Ex. 6, D. Pleconis Dep. 30:6-12.)  Additionally, to the extent that Mrs. Pleconis is arguing that she did not file taxes

11

because she was preoccupied with caring for her husband, that is insufficient under § 6511(h). As one court has noted "[a] plain reading of section 6511(h) demonstrates that the physical or mental impairment must be that of the taxpayer, not of some third person."  Brosi v. Comm'r, 120 T.C. 5, 10 (2003).  Therefore, there is no genuine dispute as to any material fact and she is ineligible for an extension under § 6511(h).[3]

**CONLUSION**

For the above stated reasons, Defendant's Motion for Summary Judgment is **GRANTED**.

/ Susan D. Wigenton
**Susan D. Wigenton, U.S.D.J.**

cc: Madeline Cox Arleo, U.S.M.J.

---

[3] Because this Court finds that Plaintiff was not financially disabled during the years in question, it will not address Defendant's arguments that Plaintiff is not entitled to the full refund he requests in his Complaint.  However, the Court notes that Plaintiff concedes that the $26,848 deduction he took in his 2000 tax return was excessive. (Pl.'s Br. 13.)